**OREGON NATURAL DESERT ASSOCIATION; Oregon Wildlife Federation; Idaho Watersheds Project; and Committee for Idaho's High Desert, Plaintiffs,**

v.

**Ed SINGLETON, in his official capacity as Vale District Manager, Bureau of Land Management; Jerry L. Taylor, in his official capacity as Jordan Resource Area Manager, Bureau of Land Management; U.S. Bureau of Land Management, an agency of the United States Department of the Interior; and Bruce Babbitt, in his official capacity as Secretary of the Department of the Interior, Defendants,**

and

**Oregon Cattlemen's Association, a nonprofit organization on behalf of its members, Intervenor–Defendant.**

**No. CIV 98–97–RE.**

United States District Court, D. Oregon.

Nov. 18, 1999.

Jack K. Sterne, Anchorage, AK, Stephanie Parent, Portland, OR, for Plaintiffs.

Kristine Olson, United States Attorney, District of Oregon, Thomas C. Lee, Assistant United States Attorney, Bradley Grenham, United States Department of Interior, Office of the Solicitor, Portland, OR, for Defendants.

Karen Budd–Falen, Jeffrey B. Teichert, Budd–Falen Law Offices, Cheyenne, WY, Jeffrey B. Wilkinson, Stewart Sokol & Gray, Portland, OR, for Intervenor-defendant.

## OPINION AND ORDER

REDDEN, District Judge.

This is an action brought by environmental groups (collectively "ONDA"), against the Bureau of Land Management ("BLM") and three individuals. Oregon Cattlemen's Association appears as an intervenor-defendant. ONDA challenges the BLM's management of the Main, West Little, and North Fork Owyhee River corridors, alleging that the BLM failed to prepare an environmental impact statement ("EIS") analyzing the effect of cattle grazing on the area, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370a, and that its management plan violates the BLM's mandate under the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1271–1284.

On November 3, 1998, the court entered summary judgment in ONDA's favor, concluding that the BLM's management plan failed to consider whether cattle grazing was consistent with the WSRA's objectives and ordering the BLM to prepare an EIS.

The court then turned to ONDA's request that the court enjoin all cattle grazing in the river corridor. The court expressed reservations about entering a complete injunction against all cattle grazing, but also stated its misgivings about continuing the status quo in the "areas of concern" identified by the BLM while the EIS was being developed. The court asked the BLM whether it were possible to expedite the EIS process; the BLM

told the court it could not. The court then asked the parties and the intervenor to confer and attempt agreement on any reasonable grazing restrictions, short of an injunction, which would address the areas of concern & -including modifications to current grazing practices, development of alternate water sources, construction of fencing, and use of riders. After several weeks, the court was informed that the parties and the intervenor were unable to agree on a single suggestion.

The parties then briefed the issue of injunctive relief. An evidentiary hearing was held on September 13, 1999.

Through two rounds of briefing and a number of status conferences, the defendants and the intervenor have consistently taken the position that a total prohibition on grazing in the river corridor is scientifically unnecessary and would be economically catastrophic for the permittees. However, they have also insisted on the practical and financial impossibility of any exclusionary options other than a prohibition on grazing, such as building fences, developing alternate sources of water, or using riders to contain herds. And despite several invitations from the court, neither the defendants nor the intervenor has proffered evidence on, or seriously discussed, the feasibility of an injunction limited to the areas of concern. Instead, the defendants and the intervenor have treated the possibility of an injunction as an "all-or-nothing" proposition, and have vehemently opposed any change in the status quo.

The court might be more inclined to maintain the status quo if it were persuaded that continuation of the BLM's current grazing management practices could lead to restoration of the areas of concern. However, the BLM has not demonstrated that its current practices have led to any significant improvement in the areas of concern over the past seven years, and the court concludes that the continued degradation of the areas of concern can be remedied only by closing these areas entirely to cattle grazing.

The BLM has previously closed certain areas to grazing but then allowed the affected permittees to add their herds to those grazing in other areas. The court therefore concludes that only the complete elimination of permits for a certain number of animal unit months ("AUMs") will prevent the possibility that cattle will be removed from one degraded area only to increase grazing pressure elsewhere.

The court now permanently enjoins cattle grazing in the "areas of concern" identified by the BLM, including the Deary Pasture area, which is currently closed. The permits for those AUMs are to be eliminated, rather than shifted to more lightly grazed areas.

### Standards Governing Injunctive Relief

The principles governing the award of injunctive relief are irreparable injury and inadequacy of legal remedies. *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). The court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Id.* Although particular regard should be given to the public interest, the court is not obligated to grant an injunction for every violation of law. *Id.* There is no presumption that environmental harm is irreparable. *Id.* However,

> [e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Id.* at 545, 107 S.Ct. 1396.

### Findings of Fact

#### Background

In 1984, Congress designated 120 miles of the Main Owyhee River as a federal wild and scenic river pursuant to the

WSRA. In the Oregon Omnibus Wild and Scenic Rivers Act of 1988, Pub.L. 100–557, *codified at* 16 U.S.C. § 1274(a)(91), Congress added 57 miles of the West Little Owyhee and nine miles of the North Fork Owyhee to the national wild and scenic rivers system. Congress classified all three segments as "wild." A wild river area is defined under the WSRA as "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." 16 U.S.C. § 1273(b). The "wild" classification is the most restrictive of three possible classifications. *Id.*

Section 3 of the WSRA required the BLM to issue a "comprehensive management plan" to "provide for the protection of the river values" within three fiscal years after designation. 16 U.S.C. § 1274(d)(1). The WSRA requires that the plan "address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter." 16 U.S.C. § 1264(d)(1).

*Conditions in the river corridor at plan implementation*

In September 1991, the BLM issued a final management plan ("the Plan"). The Plan identified five outstandingly remarkable values ("ORVs") on the Main Owyhee: scenery, geology, recreation, wildlife, and cultural. The ORVs identified for the West Little and North Fork Owyhee included recreation, scenery and wildlife. The Plan did not designate botanical or fishery ORVs, but characterized vegetation as a "key component of the visual resource, important to watershed values, wildlife habitat, and a vital part of the natural setting for recreation." Administrative Record ("AR") Tab 178, p. 24.

River scouring caused by the high volume of spring runoff confined to the narrow canyon floor precludes the development of extensive riparian vegetation, and during the hot summer season, pools and streams dry out. *See* Declaration of Gar Lorain, Exhibit 2, p. 1 ("Between the river being scoured out every other year and the minimum flow dropping to below 100 cfs every other year the riparian vegetation has little chance to gain a foothold on the Owyhee River;" *see also* Declaration of Robert Kindschy, Exhibit 2, p. 5.) Typical riparian vegetation includes wetland grasses, sedges, and rushes with "a scattering of various willow species that seldom attain tree size." Kindschy Declaration, Exhibit 2, p. 5.

The canyons through which the river runs are steep and rocky, and the canyon rims are arid. Several species of ungulates are found in the vicinity of the Owyhee Rivers, including bighorn sheep, antelope, mule deer, and wild horses. Domestic cattle and sheep have also grazed in the area for many years, under a structure of allotments and permits administered by the BLM.

Although cattle had been grazing the river corridor for many years at the time the Plan was written and implemented, the BLM recognized that in some of the river areas accessible to livestock, cattle grazing had created substantial negative effects. Cattle are grazed on 67 miles of the 186–mile river system, and the BLM found that 18 of these miles constituted "areas of livestock concern," *i.e.*, showed noticeable negative effects created by grazing. *Id.*, p. 16. The areas most affected by livestock grazing were trail crossings and "water gaps," the places where livestock come to the river to drink.

The Environmental Assessment ("EA") issued with the Plan noted that areas within at least seven of 11 grazing allotments and one trail area showed negative effects from livestock grazing, and that these negative effects had a direct impact on the scenic, recreational, and watershed ORVs of the Owyhee Rivers. AR Tab 178, p. 86–87. The seven affected allotments, and the "areas of concern" within them, were Quartz Mountain (containing Greeley Bar), Bogus Creek (containing Bull Creek), West Cow Creek (containing Bull Creek, Ryegrass/Navaro, Sand Springs/Granite

Creek, and Fletcher Trail), Saddle Butte (containing Bull Creek, Ryegrass/Navaro, Sand Springs/Granite Creek, and Fletcher Trail), Jackies Butte (containing Sand Hollow and Deary Pasture), Louse Canyon (containing Five Bar and three areas of concern around Anderson Crossing), and Campbell (containing one area of concern around Anderson Crossing). *Id.*

The EA also contained a finding that there had been livestock use ranging from heavy to slight at 56 of the 138 recreational campsites in the river corridor, AR Tab 178, p. 89, and that livestock use at 12 of these campsites—those situated at water gaps or trailing points along the corridor—was "generally heavy." *Id.*

The Plan noted this grazing damage in its statement of issues:

> At certain locations along each river segment, grazing is suspected of causing impacts to the [ORVs] identified in each river's designations. Areas of concern include Five Bar, Three Forks Deary Pasture, Sand Hollow, Fletcher Trail, Granite Creek, Sand Spring to Bull Creek, the Hole-in-the-Ground, Greeley Bar, Island Field, Squaw Creek ... Anderson Crossing, and the upper reaches of the West Little Owyhee River.

AR Tab 178, p. 16. (Of the West Little's 57.6 mile segment, only about seven miles at the headwaters, and ¼ mile at Anderson Crossing, are accessible to livestock). The negative impact of livestock grazing on ORVs was described as follows:

> conflicts with recreationists where livestock congregate, graze and deficate [sic] on and around campsites;
>
> visual impacts of livestock trailing and grazing affecting scenic and recreation values;
>
> ecological condition (status) of upland and riparian areas currently in early to mid seral status that have been or are heavily impacted by livestock grazing, trampling or defecation.

AR Tab 178, p. 16. The Plan also noted that

[s]everal areas along the river corridors have been livestock gathering routes and trailing routes for many years. Some of these areas (Five Bar, Three Forks, Fletcher Trails, Granite Creek, Sand Springs, Navaro, Ryegrass, and Bull Creek) are receiving significant impacts. Vegetation is denuded on the immediate area of trails and where livestock are gathered and concentrated for short periods of time while moving between pastures or allotments. The scenic and aesthetic quality of these areas are [sic] diminished as a result of livestock grazing, trampling, and defecation. Since many of these sites are also used for camping, recreation experience is negatively impacted. In addition, cultural sites are degraded from cattle concentrated on sites. Livestock milling breaks artifacts, compacts the ground surface and mixes the artifacts, breaks down river banks, and promotes erosion that can wash away parts of sites.

*Id.* Other parts of the administrative record also reflect concerns about livestock grazing at the time the Plan was being written. In a memorandum written in 1992 to the Jordan Resource Area Manager, BLM's Supervisory Range Conservationist, Thomas G. Miller, noted that campsites at water gaps were "hammered" by livestock. AR Tab 176, p. 1046.

*The BLM's range management objectives for the river corridor*

Section 1281(a) of the WSRA specifies the management duties of the federal agency charged with managing the designated river:

> Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic, and

scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

16 U.S.C. § 1281(a).

The Plan promulgated by the BLM specified the following objectives for range management:

Maintain or improve the vegetative cover of key species and the visual aspect of native perennial plants, within the soil and vegetative capabilities of ecological sites, in the corridor by 1999. Maintain proper utilization of key species. Minimize livestock impacts on vegetation and soils, within the river corridor, at water gaps/trail crossings, on uplands, and in riparian areas. Minimize livestock/recreation conflicts at water gaps/trail crossings by 1999.

AR Tab 178, p. 30. The Plan's first management prescription for grazing was to "[i]nventory the river corridors to determine riparian areas and potentials." The inventory was necessary because the BLM did not at the time the Plan was written have baseline data on the level of grazing that had occurred at the time the rivers were designated or that was occurring at the time the Plan was being written. *See* AR Tab 219, p. 1681 (letter from defendant Jerry Taylor noting absence of data on grazing at time of designation of rivers and observing that during drought years, 1987–94, grazing was in excess of that before designation).

However, Mr. Taylor testified at the evidentiary hearing on September 13, 1999, that this inventory has not been done, and will not be done unless and until a funding request is granted. If the funding becomes available, the inventory is scheduled to begin in 2001.

To achieve its goal of "maintaining or improving" vegetation, the Plan established three "utilization" standards: livestock could not consume more than 40% of the annual growth of "key grass species" in upland areas except for certain winter allotments, where 50% consumption was permitted, and livestock could not consume more than 30% of the annual growth of "current years leaders" for willows in riparian areas. AR Tab 178, p. 31, 61. However, at the time the standards were set, the BLM had done no utilization studies for riparian areas. *Id.* It appears from the Plan and other parts of the administrative record that the 30, 40 and 50% utilization standards represented the grazing levels in existence at the time the Plan was being written. *See, e.g.,* AR Tab 178, p. 13 ("Agricultural use is restricted to a limited amount of domestic livestock grazing ... *to the extent currently being practiced.*"); *see also* AR Tab 223, p. 1878 (letter dated March 18, 1994 from James May, Vale District Manager, to Aron Yarmo stating, "The final plan ... recommends management actions ... [which] *do not substantially change the existing direction for livestock management within the corridor.*") (Emphasis added).

The Plan further provided that

[h]erbaceous riparian vegetation will be managed to insure a properly functioning riparian system. Management may include restrictions on use levels, seasons or where feasible and compatible exclusionary fencing. Key sites will be monitored and use levels and/or management may be revised, on a case by case basis, through the allotment evaluation process. Any changes in use levels and or management must ensure plan objectives are being met. Water gaps and trail crossings will be managed so that vegetative cover does not decrease and, if possible, increases. Alternate sources of water, fencing and improved herding practices will be utilized where possible to reduce or eliminate livestock impacts at water gaps and trail crossings. Primary focus will be given to areas where camping/livestock conflicts exist.

AR Tab 178, p. 31.

*Grazing impacts since promulgation of the Plan*

The BLM asserts that since the Plan was promulgated, the overall impact of

grazing on the river corridor has decreased, and four of the areas of concern have improved. The grounds for the BLM's assertion that the impact of grazing has decreased are 1) the removal of four "areas of concern" since the closure of Deary Pasture; 2) campsite inventories showing less frequent observations of heavy or moderate cattle use in other areas of concern; 3) a survey finding that most riparian areas were in a properly functioning condition; and 4) utilization studies and mapping showing utilization within the limits set by the BLM.

*Closure of Deary Pasture*

In January 1995, the BLM sent a letter to the holders of a grazing permit for Deary Pasture, notifying them that the BLM was closing Deary Pasture to grazing for two years. Sterne Declaration, Exhibit A, p. 54–57. The letter noted that since a grazing issue had "surfaced in August 1994," *id.*, p. 54, the BLM had "several contacts" with the permit holders to "try to identify reasonable solutions to the problem." *Id.* However, according to the letter, the BLM and the permit holders had been "unable to agree on even short term measures for the immediate protection of the many resource values found within the area known as the Deary Pasture." *Id.*

The letter acknowledged that the drought of 1987–94 had caused more concentrated grazing of the Deary Pasture area in 1989, 1990, 1992, 1993, and 1994 (because of severe drought conditions, the entire Jackies Butte allotment, including Deary Pasture, was closed in the spring and summer of 1991). As a result of the heavy grazing,

> [r]iparian and upland vegetation has been overutilized, resulting in the system being left more susceptible to erosion during spring runoff events. Recreational, scenic and aesthetic values have been diminished by the impacts of livestock grazing along the river and in the surrounding areas that are accessible to livestock. Impact to these areas include [sic] excessive utilization of vege-

tation, trail proliferation, trampling, and degradation of campsites. The character of the Deary Pasture, particularly of those portions in the bottom of the canyon and adjacent to the river, has changed from that which existed at the time the river was designated a Wild and Scenic river. The full understanding of this fact and the implications it presents from a management standpoint have just recently been fully realized by the BLM.

*Id.* at p. 55. The letter went on to say that the "heavy to severe grazing of 1994 had a negative affect [sic] on the naturalness of the area as a result of the 'cropped' and trampled appearance of vegetation, the increased concentration of livestock manure, and the increase in soil disturbance as a result of very evident livestock trails." *Id.* at p. 56. The letter noted that standing vegetative litter and woody growth had been "reduced significantly by the increased frequency of grazing and overgrazing, leaving basic soil sources more susceptible to water erosion," *id.*, and that the grazing had decreased the ability of existing riparian vegetation to reduce the velocity of runoff and filter out sediments. *Id.*

A comparison of two maps issued by the BLM in 1993 and 1997 shows improvement in four out of 12 "areas of livestock concern:" Greeley Bar, Bull Creek, Deary Pasture and Three Forks. Declaration of Jeff Wilbanks, WS & R Plan 1993 Areas of Livestock Concern and WS & R Plan 1997 Areas of Livestock Concern. The elimination in 1997 of these four sites as "areas of concern" can be attributed to the complete elimination in 1995 of grazing in Deary Pasture, a five-mile stretch of the river, as can the improvement in three of the 12 campsites identified as having sustained heavy impacts from cattle. Mr. Taylor testified at the evidentiary hearing that the BLM intends to keep Deary Pasture permanently closed to grazing.

While there can be no question that the closure of Deary Pasture to cattle grazing

caused improvement in four of the areas of concern, the court is unconvinced that there is any objective basis for the BLM's representation that other areas of concern have also improved. The court is particularly troubled by Mr. Taylor's testimony that, except for the closure of Deary Pasture, the BLM has made no changes whatever since 1993 to its grazing management practices except to *increase* the number of AUMs from about 14,000 to over 16,000 in four pastures within the Jackies Butte grazing allotment. Mr. Taylor testified that the BLM increased the AUMs because 1993 and 1997 were wet years which yielded improved vegetation. This testimony virtually compels the conclusion that to the extent any improvement has been noted in areas other than Deary Pasture, that improvement must be attributed to climatic conditions such as good water years, rather than to conscious efforts by the BLM to reduce or control cattle grazing to minimize livestock impact.

*The evidence from campsite inventories*

Mr. Taylor testified that improvement has been noted at Greeley Bar, Bull Creek and Three Forks. He explained that the BLM's objective basis for finding improvement in these areas of concern is primarily through campsite inventories, which deal with the impact from both livestock and recreational users at particular campsites.

Campsite inventories are, according to Mr. Taylor, primarily subjective and qualitative, and do not correlate observed "impact" to utilization standards; they therefore do not indicate whether utilization standards are being exceeded. The basis for the BLM's conclusion that campsite inventories indicate improvement in three areas of concern is that the number of "heavy" and "moderate" impact observations in those areas has declined since 1993.

According to Mr. Taylor's testimony, campsite inventories are done only between March and June. (The growing season occurs in the spring and summer, although grazing permits show that cattle are grazed within the river corridor 12 months a year. See Declaration of Jack Sterne, Exhibit A.)

A campsite inventory questionnaire does not inquire about the amount of vegetation that has been utilized (*i.e.*, eaten), but rather requires visual observation of the amount of vegetation that has been "disturbed," whether by grazing, trampling, uprooting, or erosion. The campsite inventory does not distinguish among species of vegetation.

In the context of a campsite inventory, heavy, moderate and light use are "relative terms based on ... impact observations." Exhibit K, p. 7. Degree of use is "determined by observing the amount of vegetation removed, trampling, feces, trail proliferation, soil compaction and erosion, and root exposure." *Id.*

"Heavy use" means that 50% or more of the vegetation has been "disturbed." "Moderate" use means that between 11 and 49% of the vegetation has been disturbed. See Plaintiffs' Exhibit R. Thus, although vegetation "disturbance" does not directly correlate to "utilization," the court notes that even "moderate" use of vegetation (up to 49%), if by grazing, will significantly exceed the Plan's utilization standards of 30% for willows and 40% for herbaceous vegetation.

Exhibit K shows a campsite inventory made on January 15, 1999 at Ryegrass Hot Springs. Exhibit K, p. 61. Ryegrass is an area of concern. The observer notes that the area adjacent to the river, on both the east and west sides, shows signs of "heavy" grazing, *i.e.*, that more than 50% of the vegetation has been disturbed. Within the same exhibit is a series of campsite inventories done in March 1999 and containing observations of several areas of concern within 14 river miles: Sand Springs, Granite Creek, Navaro, Ryegrass Hot Springs, and Bull Creek Crossing. Ryegrass Hot Springs, Sand Springs and Bull Creek Crossing show "heavy cow use;" Ryegrass Hot Springs also shows usable camp space reduced by 75% or more as a result of livestock feces concen-

tration. Fletcher Trails shows "moderate" (up to 49%) disturbance in vegetation and "moderate" livestock feces concentration ("moderate" livestock feces concentration means 26–89% useable camp space remaining). Granite Creek and Navaro show moderate cattle use, as does Greeley Bar, which also shows moderate livestock feces concentration. A campsite inventory of Greeley Bar done one month later, on April 7, also shows moderate cattle use.

Page 75 of Exhibit K is a report from district fisheries biologist Cynthia Tait dated April 28, 1999. She reports on a four-day river patrol of the upper Owyhee from the Idaho Border to Three Forks. She notes that at river mile 173, utilization by cattle was "heavy," with herbaceous stubble less than two inches, willows only two to eight inches high and repeatedly browsed, and sagebrush crushed. ("Heavy" herbaceous or willow utilization is 61–80% & –well in excess of the utilization standards set by the Plan. Government's Exhibit 115, p. 4–5.) At river mile 173, Tait records beach terraces impacted by grazing, trampling, and closely spaced manure. She notes that utilization is heavy to severe, with a mown appearance to herbaceous vegetation and broken sage plants. ("Severe" herbaceous utilization is 81–100%. Exhibit 115, p. 4.)

Tait recorded continued signs of heavy livestock use downstream to Five Bar (river mile 171), where cattle were present on both sides of the river. Herbaceous vegetation on sites accessible to cattle "had a mown appearance or was grazed to the soil surface, indicating severe utilization." Although some of the river corridor observed by Tait is private or state land, she recommended that "[u]nless management on those private and state lands can be substantially changed, it may become necessary to withdraw and exclude BLM lands along the river from those allotments." Exhibit K, p. 75.

Although the evidence of livestock utilization is scanty for the years 1998 and 1997, campsite observers of Navaro and Ryegrass Hot Springs in June 1998 recorded moderate impact. Exhibit L, p. 38–39. The area two miles upstream of Five Bar Ranch showed heavy forage utilization in May 1998. Exhibit L, p. 53. The observer noted that non-desirable forage such as sage shrubs and quack grass was being eaten because preferred grass species had already been fully consumed. Id. The observer said, "Other riverside terraces in this area also exhibited heavy utilization." Id. In March 1998 and again in October 1997, moderate grazing impact was observed at Three Forks. Exhibit L, p. 54.

Heavy use was noted on two occasions in March 1997 at Fletcher Trail. Second Declaration of Jerry Taylor, p. 3. Ryegrass Hot Springs also showed heavy use on two occasions in March 1997. Id.

*Surveys showing properly functioning riparian conditions*

Mr. Taylor testified that another indicator of improved conditions in the river corridor was the BLM's recent finding of attainment of Properly Functioning Condition of Riparian Areas on 146.5 miles of the river areas (93%), with 6.8 miles (4.4%) functioning at risk.

According to the BLM, "properly functioning riparian condition" means that adequate vegetation, landform, or large woody debris is present to:

1) dissipate stream energy associated with high waterflows, thereby reducing erosion and improving water quality;

2) filter sediment, capture bedload, and aid floodplain development;

3) improve flood-water retention and ground-water recharge;

4) develop root masses that stabilize streambanks against cutting action;

5) develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and

6) support greater biodiversity.

Defendants' Exhibit 105, p. 3.

Only 67 miles of the 186–mile river system is accessible to livestock. The evidence does not reveal how many of those 67 miles are encompassed within the 146.5 miles found to be properly functioning, how many are within the 39.5 miles still to be assessed, and how many are included in the 6.8 miles which are functioning at risk. (The areas of concern identified in 1993 comprise about 18 miles). The attainment of properly functioning condition in 146.5 miles, without more, does not provide the court with any basis for determining the condition of the areas of concern.

The court notes that in a September 1995 West Little Owyhee habitat survey, the observer noted, at virtually all reaches, that land use was "heavy cattle grazing;" the observer also recorded high percentages of actively eroding banks (86–100%) at five out of seven reaches. Three years later, in August 1998, four segments of the West Little Owyhee were surveyed and, while all were found in properly functioning condition, each listed, under "Rationale for Rating:" "Needs grazing change of use." Plaintiffs' Exhibits FF–II.

Despite the evidence of degradation in 1995, the equivocal nature of the "properly functioning" findings in 1998, and the 1998 recommendation that there be a change of use, Mr. Taylor testified that the BLM has not reduced animal numbers or seasons of use on the Upper West Little Owyhee.

*Utilization mapping*

The utilization maps submitted to the court show that the BLM has averaged together lightly-grazed upland areas and heavily-grazed riparian areas in order to represent that utilization standards are being met; the areas nearest the river—*i.e.*, the areas of concern themselves—show utilization substantially in excess of the standards set by the BLM.

A utilization map of the Navaro/Ryegrass watergap shows utilization of one herbaceous species at 55% in two different areas. Plaintiffs' Exhibit Q, p. 2. A map of the area of concern at Navaro shows 40–60% utilization of two herbaceous species. *Id.* at p. 16. A utilization map for Ryegrass watergap area of concern shows herbaceous use levels at 65%, 55%, 58% and 48% for four species, and willow utilization at 50%. *Id.* at p. 17.

A utilization map of Bull Creek watergap shows utilization levels of two herbaceous species at 65% and 59%. *Id.* at p. 3. Another utilization map for Bull Creek shows 65% use level on two herbaceous species within the area of concern and along the river corridor. The upland area away from the river shows 0–20% utilization.

A utilization map of Sand Springs and Granite Creek shows utilization for one herbaceous species ranging from 53–39%; for the other, utilization ranges from 54% to 25%, with the area showing 25% substantially smaller. *Id.* Another utilization map for the same area shows utilization levels ranging from 0–53%, with the higher numbers closest to the river, and the lower levels in the uplands. *Id.* at p. 12. Mr. Taylor showed the court a slide of Sand Springs, and testified that the site was in "such a degraded condition, based on historic grazing, that we don't really expect this to jump in condition any time soon." Mr. Taylor testified that Ryegrass, like Sand Springs, was in an early seral stage. (Early, mid- and late seral are terms which reflect kinds, amounts, and proportions of vegetation occurring within a site. Good condition range is late seral; fair condition is mid-seral, and poor condition is early seral.)

A utilization map for Fletcher Trails shows utilization levels for four different herbaceous species at 59%, 70%, 46% and 66% for about half of the area of concern. Willow utilization within that area ranges from 15% to 37%. A memorandum from David Wallace, rangeland management specialist, states that for Fletcher Trails, the riparian vegetation where the trail meets the river shows utilization in the heavy to severe category. "Heavy" herbaceous utilization is 61–80%; "severe"

herbaceous utilization is 81–100%. Government's Exhibit 115, p. 4. Mr. Taylor acknowledged that Fletcher Trails gets "quite a bit of use." (Fletcher Trails is an area grazed by both cattle and wild horses.)

Despite the evidence of heavy livestock use from campsite inventories, and utilization mapping which shows that utilization standards are substantially exceeded in the areas nearest the river, there is no evidence that the BLM has ever decided to reduce the number of AUMs in those areas. Thus the BLM's practice contradicts even the recommendation of the intervenor's expert, who states that "[w]hen the key species are grazed to a predetermined level then grazing is terminated." Declaration of Gar Lorain, Exhibit 2, p. 5.

*Other evidence*

In a memorandum dated December 1997, Dave Wallace, a BLM rangeland management specialist, noted incidents in which "Jackies Butte permittees are manipulating and abusing the flexibility [in pasture rotation] that I have allowed. The permittees are twisting any flexibility that I provide to gain maximum grazing and are not demonstrating good stewardship." Exhibit T, p. 15.

Other memoranda from Wallace document that the BLM's efforts at pasture rotation were ineffective in preventing undue grazing pressure around water locations, particularly during the hot months of July and August; that monitoring grazing impact by AUMs was hindered because permittees allowed cattle to drift and failed to conform with the BLM's pasture rotation requirements; and that the permittees, while aware of the BLM's issues and concerns "are not going to provide any practical solutions for these issues," and were "not taking responsibility for their grazing use and resulting impacts." Exhibit T, p. 17; *see also* Exhibit T, p. 24 (pasture rotation and other grazing requirements not observed by the permittees; "[t]he last half of the grazing season resulted in the most inorderly and 'willy-nilly' use within any Public Land allotment that I have ever witnessed.")

In March 1999, BLM range specialist Rich Law observed a white Chevrolet pickup with a flatbed sunk in the Middle Fork Owyhee. The truck had been used to transport salt supplements to cattle grazing near the river, although the terms and conditions of the grazing permits prohibit the use of salt or other mineral supplements near the river.

In August 1999, Katie Fite, a biologist who had been active in bringing conditions in Deary Pasture to the BLM's attention, wrote a letter to Mr. Taylor describing her observations of areas around the West Little Owyhee in July 1999, and enclosed photographs of some of those areas. Her observations included:

1. Trampled creek banks and signs of heavy grazing at Jackson Creek.

2. Severely damaged springs and seeps near the Anderson Crossing road, with livestock having completely "stripped the vegetation and pounded it into a mass of mud." Ms. Fite also noted that livestock were "wallowing well above their knees in the slime that passed for water here."

3. Salt located in several places near wet meadows and springs along the main road between Antelope Creek and Anderson Crossing, near Exchange Spring, and within 20 feet of a running spring.

4. Cattle defecating in the water, trampling stream banks, and grazing heavily upstream of Anderson Crossing.

Even the intervenor's expert witness, Gar Lorain, has opined that hot springs or other springs "could have unique [plant] species subject to fairly heavy grazing. These areas should be fenced to protect their unique characteristics." Declaration of Gar Lorain, Exhibit 2, p. 2. However, there is no indication that the BLM has responded to these observations with any reduction in the number of grazing animals or modification of grazing practices.

### Conclusions of Law

The WSRA states the policy of the United States that certain designated rivers which possess "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural or other similar values," shall be "preserved in free-flowing condition" and that the rivers and their immediate environments be "protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271.

Although the BLM asserts that its grazing management practices have generated improvements in the areas of concern first identified in 1993, the court concludes that the assertion is unsubstantiated by objective evidence except for the closure of Deary Pasture. Perhaps the most troubling evidence is Mr. Taylor's testimony that the numbers of animals and the seasons of use have remained completely unchanged since implementation of the Plan, except when grazing permits have been increased to exploit good water years.

As the court noted in its November 3, 1998 decision, the utilization standards adopted by the BLM were not based on scientific data, but rather appeared to quantify the status quo. However, the utilization maps show that even these standards are substantially exceeded in riparian areas, and it is only by averaging riparian and upland areas that the BLM can make a colorable claim that the utilization standards are being met. Sand Springs, for example, was identified as an area of concern in 1993. Mr. Taylor testified that the area was in an extremely degraded condition as a result of historic grazing. Nevertheless, utilization mapping and campsite inventories show that this area continues to receive heavy use from cattle.

Nor do the campsite inventories suffice to provide any objective basis for the BLM's assertions of improvement in the areas of concern. Mr. Taylor testified that for the BLM, improvement is determined by declining numbers of "heavy use" observations. However, the evidence shows numerous examples of heavy use observations. Moreover, these observations are subjective in nature and do not correlate to utilization standards. In fact, the percentages on which both heavy and moderate impacts are based are greatly in excess of the utilization standards.

The BLM's finding that most of the river corridor is in properly functioning riparian condition is not probative with respect to improvement in the areas of concern because the percentages provide no specific information about areas of concern.

Other data gathered since 1993—the surveys of the West Little Owyhee, for example—consistently indicate heavy cattle grazing and erosion.

The Plan provided that restrictions on levels and seasons of use would be implemented where necessary to ensure that utilization standards were met, riparian vegetation was in a properly functioning condition, and livestock impacts on vegetation and soils within the river corridor, at water gaps and trail crossings were minimized so that vegetative cover would not decrease and, if possible, would increase. See, e.g., AR Tab 178, p. 30–31. None of this has been done. Mr. Taylor testified that the BLM has neither made changes to seasons of use nor reduced the number of AUMs permitted for any of the allotments since the Plan was implemented. In fact, Mr. Taylor admitted that the BLM has actually *increased* the number of AUMs in some allotments, because greater than anticipated rainfall had yielded more vegetation. The court is troubled by this indication that the BLM regards beneficial natural events as justifications for increased grazing, rather than as opportunities for recovery and enhancement of natural resources.

### The Public Interest and the Balance of Equities

*Factors favoring closure of the areas of concern*

The WSRA charges the BLM with administering "each component of the nation-

al wild and scenic rivers system" in a manner which will "protect and enhance the values which caused it to be included in said system." 16 U.S.C. § 1281(a). In that administration, "primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic, and scientific features." *Id.*

The values and special attributes of each river segment are enumerated in the 1993 Plan. Recreation values on the Main Owyhee include rafting, drift boating, kayaking, hiking, photography, nature study, fishing, hunting, camping, and rockhounding. The West Little river segment offers very high quality primitive recreation experiences, including off-trail backpacking, swimming, hiking, wildlife viewing, and hunting. The North Fork Owyhee offers very high quality backpacking opportunities, early season expert level kayaking, hiking, hunting, camping, wildlife viewing and photography.

The scenic values of the Owyhee River include its dramatic landforms, whitewater, and slow-moving pools. The West Little Owyhee is characterized by canyons, flat sagebrush plateaus, and secluded pools confined by sheer rock walls; between the pools are reaches that flow as riffles or rapids during periods of high water, and become sandy or gravelly dry beaches in the dry, hot summer months. The North Fork of the Owyhee combines canyon bottoms overshadowed by steep canyon walls with flat high sagebrush desert.

Over 200 species of wildlife are found in the river canyons and the sagebrush desert on the rims. Birds include nesting raptors such as hawks, kestrel, falcon, and golden and bald eagles; game birds such as partridge, quail, mourning dove and sage grouse; waterfowl; and song birds. Mammal species include California bighorn sheep, mule deer, wild horses, pronghorn antelope, mountain lion, bobcat, coyote, badger, beaver, otter, muskrat, marmot, raccoon, porcupine and rabbit.

Several plant species within the canyonlands are classified as federal or state sensitive species or are on "watch lists." The preservation of all of these features is in the public interest.

Congress has classified the three river segments as "wild," the most restrictive of three WSRA classifications. A wild river area is defined under the WSRA as "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." 16 U.S.C. § 1273(b). The public interest also includes the public policy stated by Congress of preserving these rivers in as pristine and unpolluted a condition as possible.

It has been almost seven years since the BLM recognized that cattle grazing was creating noticeable negative effects on the rivers' values in some parts of the corridor. The BLM found that grazing conflicted with recreational values where livestock congregated, grazed and defecated around campsites; that the visual impact of livestock trailing and grazing affected scenic and recreation values; and that the ecological condition of upland and riparian areas was being degraded by livestock grazing, trampling and defecation. The BLM designated specific areas of concern in 1993, and stated its goal of managing those areas so as to maintain or improve the vegetative cover of key species and the visual aspect of native perennial plants, ensure proper utilization of key species, minimize livestock impact on vegetation and soils, and reduce livestock/recreation conflicts. AR Tab 178, p. 30.

Although the BLM asserts that it has met these objectives, the evidence shows that, with the exception of the areas around Deary Pasture, grazing in the areas of concern has been neither reduced nor otherwise regulated. The same observations of heavy grazing, trampling, and bank erosion reported in 1993 have continued well into 1999. The persistent degradation of these areas, and the BLM's apparent inability to manage cattle grazing in a manner which would repair and restore the areas of concern has serious negative consequences for the recreational,

scenic and ecological values of the designated rivers. These negative effects have existed for many years and there is no indication that they will change significantly in the future.

*Economic impact on permittees of closing areas of concern*

■ The grazing allotments within the river corridor enable private cattle and sheep ranchers to graze their livestock on publicly-owned land, typically at below-market rates. Although the parties dispute the dollars involved, it is uncontroverted that grazing permits constitute a public subsidy to livestock operators, sometimes a substantial one. The court notes that grazing privileges on publicly-owned land are not property rights, and the government is under no obligation either to provide or to continue them.

At present, the total AUMs for the 19 grazing allotments and 58 ranching operations in the river corridor are approximately 104,000. Declaration of Frederick W. Obermiller, Exhibit 2, p. 6. Closure of the areas of concern would represent a loss of 26,976 AUMs, or about 26% of the total in the river corridor. *Id.*

*Economic impact on Malheur County of closing areas of concern*

According to the government's evidence, the total personal income in Malheur County is $491 million. According to a study by plaintiffs' expert witness Hans Radke, an agricultural economist, the total income generated by the livestock industry in Malheur County is approximately $30 million a year—about 6% of the county's total personal income. The intervenor disputes this amount, arguing that agriculture and agriculture-related businesses generate about $92 million per year. Neither the government nor the intervenor has submitted evidence on the economic consequences to the affected permittees of closing the areas of concern. However, according to figures submitted by the plaintiffs, which neither the government nor the intervenor disputes, the maximum amount of personal income lost to Malheur County by eliminating 26,976 AUMs would

be $692,204—approximately .023% of the county's total livestock income, using Radtke's $30 million figure. Because neither the government nor the intervenor has provided the court with evidence on prospective income loss to livestock-related businesses caused by the elimination of 26,976 AUMs, I make no finding on the economic impact to livestock-related businesses within Malheur County.

The Fort McDermitt Indian tribe has submitted a letter to the court urging the court not to enjoin all grazing on the Owyhee Rivers because the Tribe is economically dependent on its grazing permits. The Tribe is not a party to this case. None of the parties has submitted evidence showing the number of AUMs permitted to the Tribe, the location of its allotments, or the economic effect upon the Tribe, if any, of enjoining cattle grazing in the areas of concern. The Tribe also asserts that the elimination of cattle grazing would adversely affect its sacred burial sites. I find this assertion meritless.

■ The public interest in requiring the BLM to implement the Congressional mandate contained in the WSRA is manifest, as is the public's interest in preserving and enhancing the extraordinary values of the Owyhee Rivers. The continued degradation of the areas of concern within the river corridor constitutes irreparable harm, and there are no legal remedies available to redress this harm. While a 25% reduction in subsidized grazing privileges will have an adverse economic effect on some of the individual permit holders, its overall effect on the county's economy is negligible.

For these reasons, the public interest and the balance of equities require the issuance of an injunction directing the BLM to exclude the areas of concern from any further grazing by domestic livestock.

*Injunction*

On the basis of the findings of fact and conclusions,

IT IS ORDERED:

1. The Bureau of Land Management is enjoined to eliminate, permanently, domestic sheep and cattle grazing from all of the areas of concern identified in the 1993 Plan, commencing April 1, 2000.

2. The Bureau of Land Management is enjoined to eliminate, permanently, any and all grazing permits which allow the presence of domestic sheep and cattle in the areas of concern at any time of the year, as of April 1, 2000.

3. The Bureau of Land Management is enjoined to take any other action necessary and feasible to exclude livestock from the aforementioned areas of concern at all times of the year as of April 1, 2000.

4. If, before April 1, 2000, the parties, or any of them, reach agreement on an alternative method for eliminating the negative impact of domestic livestock grazing in the areas of concern, it or they may submit a proposal, and the court will consider ordering implementation the alternative rather than entering the injunction.

5. The court will retain jurisdiction until the BLM reports to the court that the EIS has been completed.

IT IS SO ORDERED.